**SIGNED THIS: June 19, 2012**

_Mary P. Gorman_

_____
**Mary P. Gorman**
**United States Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| In Re | ) | |
| | ) | Case No. 09-71814 |
| KEVIN R. COAY and, | ) | |
| GAIL L. COAY, | ) | Chapter 13 |
| | ) | |
| Debtors. | ) | |

## O P I N I O N

Before the Court is the Chapter 13 Trustee's Motion to Amend Chapter 13 Plan. The Trustee

seeks to require the Debtors to increase their monthly payments in order to increase the dividend to

be paid to unsecured creditors under a confirmed Chapter 13 plan. In essence, the Trustee is seeking

to reset the Debtors' disposable income calculation post-confirmation. Because the Trustee failed

to prove his entitlement to the relief requested, the Trustee's Motion to Amend Chapter 13 Plan will

be denied.

## I. Factual and Procedural Background

Kevin R. Coay and Gail L. Coay ("Debtors") filed their voluntary petition under Chapter 13 on June 15, 2009. At that time, they also filed the required schedules, Statement of Financial Affairs, and Official Form 22C — Chapter 13 Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income ("B22C").

On their Schedule A — Real Property, Debtors disclosed ownership of their residence in New Berlin, Illinois, which they valued at $135,000. On Schedule B — Personal Property, the Debtors stated that they owned two vehicles — a 1999 Dodge Durango valued at $2550 and a 2004 Chrysler Sebring valued at $1900. They also disclosed ownership of modest amounts of clothing, household goods and furnishings, and other personal property. Debtors claimed all of their real and personal property exempt on their Schedule C, and no party in interest objected. On Schedule D, Debtors listed Marine Bank as having a first mortgage on their home in the amount of $138,000 and Ditech as having a second mortgage in the amount of $51,000. Debtors also identified Capital One Finance as having a lien on the Sebring to secure a debt of $7253.

Debtors stated on their Schedule I that Mr. Coay was employed as a production manager at Dawn Foods in Indiana and was earning a monthly gross income of $4801.28. Mrs. Coay identified her employer as Mel-O-Cream and her monthly gross income as $2272.52. From their combined monthly gross income of $7073.80, the Debtors itemized $1853 in various payroll deductions, resulting in combined monthly net income of $5220.80. On their Schedule J, the Debtors listed $4732 in monthly expenses and, therefore, stated that their monthly net income after expenses was $488.80.

On their B22C, the Debtors calculated their "current monthly income" — their average monthly income during the six month period before filing — as $7073.80. Based on their household size of four, the Debtors' initial B22C calculations resulted in a determination that their applicable

commitment period would be five years and their disposable income would be calculated under §1325(b)(3). 11 U.S.C. §1325(b)(3). On the expense portion of the B22C, the Debtors listed $2779.27 in deductions, which resulted in $4294.53 being shown as their monthly disposable income. The deductions taken on the B22C, however, failed to include any amounts for housing or utilities, the first or second mortgage payments, mortgage arrearages, vehicle operating or ownership expenses, auto loan payments, or health care expenses.

Debtors filed their Chapter 13 Plan ("Plan") on July 1, 2009. In their Plan, Debtors proposed to pay their attorney fees, the Trustee's compensation, an arrearage in an unspecified amount to Marine Bank, and $1600 to unsecured creditors. Debtors proposed to fund these disbursements by paying the Trustee $400 per month for 60 months. The Plan proposed to treat Ditech as fully unsecured and made no mention of the secured debt to Capital One Finance. The Plan drew objections from the Trustee and Marine Bank.

Also on July 1, 2009, the Debtors filed Amended Schedules I and J. On their Amended Schedule I, the Debtors reduced the amount of payroll taxes deducted from Mrs. Coay's pay and also deleted a garnishment deduction from her pay which had stopped when the case was filed. These changes increased their monthly net income to $5765.44. The Debtors also noted, however, that as of June 30, 2009 — the day before the Amended Schedule I was filed — the plant at which Mr. Coay worked was closing, that he was losing his employment, and that he would be receiving $1690 per month in unemployment benefits. On their Amended Schedule J, the Debtors deleted rent and travel expenses associated with Mr. Coay's work in Indiana and deleted the regular monthly payment to Ditech for the second mortgage that they were proposing to treat as unsecured in their Plan. After a few other minor adjustments, total monthly expenses were reduced to $3132. Combined, the Amended Schedules I and J showed a monthly net income after expenses of $2633.44.

On October 6, 2009, the Debtors filed a Second Amended Schedule I. The Debtors reduced

Mr. Coay's income to the $1690 in unemployment benefits he was then receiving each month. Combined with Mrs. Coay's earnings, the Debtors showed their monthly gross income at the time to be $3962.52.

At the same time, the Debtors also filed an Amended B22C. Because the Amended B22C related back to the petition date, the income calculations on the form were unchanged from the original B22C. The Amended B22C increased total expense deductions to $5293.99 by adding deductions for the ongoing first mortgage payment, vehicle operating and ownership expenses, and health care expenses. The Amended B22C did not include a deduction for the payment of the mortgage arrearage amounts due to Marine Bank. The Amended B22C also deleted the deduction for taxes being paid on Mr. Coay's income which he was still earning — and paying taxes on — at the time of filing and which had been included on the income side of the Amended B22C. The Amended B22C shows the Debtors' monthly disposable income as of the date of filing to be $1779.74.

The Debtors also filed an Amended Chapter 13 Plan ("Amended Plan") with their Second Amended Schedule I and Amended B22C. The Amended Plan provided for payment of attorney fees and Trustee compensation, $16,048.97 in mortgage arrearages to Marine Bank, $2000 in real estate taxes to Sangamon County, and $2000 to Capital One Finance on its secured claim. Ditech continued to be treated as unsecured in the Amended Plan. The Debtors proposed that $9103 would be available to pay unsecured creditors and indicated that would result in a dividend of approximately 6%. The Trustee and Capital One Finance objected to the Amended Plan.

A Second Amended Chapter 13 Plan ("Second Amended Plan") was filed on December 1, 2009. In the Second Amended Plan, the Debtors proposed to pay attorney fees, Trustee compensation, and $16,048.97 to Marine Bank for mortgage arrearages. Because the past-due real estate taxes had been paid by Marine Bank and included in its claim, the proposed payments to

Sangamon County included in the Amended Plan were deleted from the Second Amended Plan. The proposed payment to Capital One Finance was increased to $3340 plus 6% interest. Ditech continued to be treated as unsecured, and the Debtors stated that "approximately $10,631.03" would be available to pay unsecured creditors an anticipated dividend of 7%. The Debtors proposed to fund the Second Amended Plan by making 60 monthly payments of $600. No objections to the Second Amended Plan were filed, and it was confirmed on January 6, 2010.

In the meantime, however, the Debtors fell behind on their regular mortgage payments to Marine Bank, and Marine Bank filed a Motion for Relief from Stay. At a hearing on January 7, 2010 — just one day after the confirmation order was entered — the Debtors, represented by counsel, raised no objection to Marine Bank's Motion. An order was entered the next day granting stay relief to Marine Bank. The order, prepared by Marine Bank's attorney, provided that Marine Bank was withdrawing its previously-filed claim and, therefore, would not receive any of the payments from the Trustee which had been provided for in the confirmed Second Amended Plan.

The Trustee filed his Motion to Amend Chapter 13 Plan on July 26, 2011, seeking to increase the Debtors' monthly payments to $821.73. The Trustee asserts that the current payments being made pursuant to the Second Amended Plan will yield an 80% dividend to unsecured creditors, but that dividend will increase to 100% if his Motion to Amend is granted. The Trustee bases his request on the Debtors' 2010 income tax return, which he says shows a significant increase in the Debtors' earnings since confirmation. The Debtors have resisted the Trustee's Motion to Amend. After a number of delays, an evidentiary hearing was held on February 7, 2012.

Mr. Coay was the only witness called to testify at the hearing. He stated that after the Dawn Foods plant closed at the end of June 2009, he received $1690 per month in unemployment benefits until April 2010. At that time, he found employment at Saputo Cheese in Lena, Wisconsin. Mr. Coay worked at Saputo Cheese for an annual salary of $57,000 until November 2010. During the time he

worked at Saputo Cheese, he traveled from Lena, Wisconsin, to central Illinois, every weekend to

be with his wife and children. In November 2010, Mr. Coay found employment at Bunn-O-Matic

in Springfield at an annual salary of $47,000.

At the time of the hearing, Mr. Coay was still working at Bunn-O-Matic and his December

15, 2011, two-week pay stub from that employment was admitted into evidence. His pay stub

showed year-to-date gross income of $45,938.25. Mrs. Coay's June 29, 2011, pay stub from Mel-O-

Cream was also admitted into evidence. That pay stub showed her year-to-date earnings as

$12,074.86.

Additionally, the Coays' 2009 and 2010 federal income tax returns were admitted into

evidence. The 2009 return showed combined gross income of $82,627, which included $6285 in

unemployment benefits and $3925 in IRA withdrawals. The 2010 return showed $101,094 in gross

income, of which $4215 was unemployment benefits and $1490 was IRA withdrawals. Mr. Coay

claimed that approximately $25,000 of the income shown on the 2010 return related to the payment

of moving and relocation expenses by Saputo Cheese and did not represent actual cash or spendable

income.

The Trustee has filed a brief in support of his Motion to Amend. The matter is now ready for

decision.

## II. Jurisdiction

This Court has jurisdiction over the issues presented here pursuant to 28 U.S.C. §1334. Issues

regarding the modification of a confirmed Chapter 13 plan are core proceedings. *See* 28 U.S.C.

§157(b)(2)(A),(O).

### III. Legal Analysis

The Trustee is alleging that the Debtors have more disposable income now than they had when their Second Amended Plan was confirmed and, therefore, they should be required to pay more to their unsecured creditors. Debtors have denied that they have the ability to pay more. Further, neither statutory nor case law supports the Trustee's legal position that the Debtors' disposable income may be reset after confirmation or that a Chapter 13 Trustee may require a recalculation of disposable income by a motion to amend a confirmed plan[1]

### A. Section 1325(b) Does Not Apply to §1329 Plan Modifications

The concept of disposable income is set forth in §1325(b)(1) which provides as follows:

(b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan –

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

11 U.S.C. §1325(b)(1).

Debtors are not required to commit all of their projected disposable income to plan payments unless or until the Trustee or an unsecured creditor objects and then, only if they have not otherwise

---

[1] In his brief, the Trustee acknowledges that §1325(b) does not apply to plan modifications. But, his Motion to Amend, evidentiary presentation, and arguments all attempted to make the case that the Debtors' purported increase in income forms a basis for requiring them to pay more to unsecured creditors. The Trustee's sole premise is that the Debtors have an increased ability to pay. Regardless of how the Trustee characterizes his request, his Motion to Amend seeks to reset the Debtors' disposable income and must be analyzed as such.

provided to pay all claims in full. 11 U.S.C. §1325(b)(1). Disposable income is calculated by determining a debtor's "current monthly income" as defined by statute, subtracting from it reasonable and necessary expenses, and multiplying the difference by the number of months in the debtor's applicable commitment period. 11 U.S.C. §1325(b)(2)-(3). "Current monthly income" is calculated by averaging the income earned by a debtor during each of the six calendar months preceding a case filing. 11 U.S.C. §101(10A). For higher income debtors, the deductions for some reasonable and necessary expenses are fixed in amount by the National and Local IRS standards. 11 U.S.C. §1325(b)(3); 11 U.S.C. §707(b)(2)(A)-(B). A debtor's "applicable commitment period" is calculated on the B22C form and results in higher-income debtors generally having a 60-month period and lower-income debtors having a 36-month period. 11 U.S.C. §1325(b)(4). Once all of the calculations have been made according to statute, the actual amount of disposable income that a particular debtor must pay unsecured creditors over the term of the plan may be adjusted due to significant changes in circumstances which are known or virtually certain at the time of confirmation. *Hamilton v. Lanning*, ___ U.S. ___ ,130 S.Ct. 2464, 2478 (2010).

Confirmed Chapter 13 plans may be modified under certain circumstances. 11 U.S.C. §1329. Proposed modifications are limited to the purposes expressly set forth in the statute. *Matter of Witkowski*, 16 F.3d 739, 745 (7th Cir. 1994). Those purposes include increasing or decreasing payments to particular classes of claims, extending or reducing the time for payments to be made, taking into account payments made to a creditor other than through the plan, and reducing plan payments to account for the cost of health insurance premiums paid. 11 U.S.C. §1329(a). Further, some, but not all, of the requirements for initial plan confirmation apply to plan modification. Specifically, §1329(b)(1) provides:

> (b)(1) Sections 1322(a), 1322(b), and 1323(c) of this title and the requirements of section 1325(a) of this title apply to any modification under subsection (a) of this section.

11 U.S.C. §1329(b)(1).

Here, the Trustee's Motion to Amend seeks to increase payments to the class of unsecured creditors and, therefore, seeks relief available pursuant to statute. 11 U.S.C. §1329(a)(1). But, because the Trustee's Motion to Amend seeks to recalculate the Debtors' disposable income, it appears to rely on §1325(b) for substantive authority. And, because §1325(b) is not one of the provisions identified in §1329(b)(1) as applying to plan modifications, the issue arises whether the Trustee can require a resetting of the Debtors' disposable income by filing a Motion to Amend and, if he cannot, whether some other provision of the Code supports the Trustee's request for an increase in plan payments for unsecured creditors.

This Court has previously held that, because §1325(b) is not made applicable to plan modification by §1329(b)(1), plan modifications are not analyzed under a disposable income test. *In re Walker*, 2010 WL 4259274, at *10 (Bankr. C.D. Ill. Oct. 21, 2010). If the disposable income provisions of §1325(b) do not apply to plan modifications, those provisions cannot provide substantive authority for the Trustee to require the Debtors to increase their plan payments for unsecured creditors.

In holding that disposable income is not an issue to be considered in plan modifications, the starting point of the analysis must be to give plain meaning to the language of the statute. *United States v. Ron Pair Enterprises, Inc*., 489 U.S. 235, 241 (1989); *see also Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) (a court's inquiry may be limited solely to the plain meaning analysis unless the result is absurd). The express language of §1325(b) limits its applicability to plan confirmation. Plan modification is a separate and distinct proceeding from plan confirmation. Clearly, a plan must already have been confirmed in order for a modification to be requested pursuant to §1329. *See In re Davis*, 439 B.R. 863, 866 (Bankr. N.D. Ill. 2010) (citing *Forbes v. Forbes (In re Forbes)*, 215 B.R. 183, 188 (B.A.P. 8th Cir. 1997)). Of course, when a plan has yet to be confirmed, it may be

modified, but such modification is not controlled by the provisions of §1329. *See* 11 U.S.C. §1323.

Further, §1329(b)(1) expressly lists the specific provisions of Chapter 13 which apply to plan

modifications. Implicit in that provision is the exclusion of other unenumerated Chapter 13

provisions. *See Davis,* 439 B.R. at 867 (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001)); *see*

*also In re Young*, 370 B.R. 799, 802 (Bankr. E.D. Wis. 2007); *In re Forte*, 341 B.R. 859, 864 (Bankr.

N.D. Ill. 2005); *but see In re King* 439 B.R. 129, 134 (Bankr. S.D. Ill. 2010). If §1329(b)(1) is to

have meaning, it must be given its plain meaning. The plain meaning of §1329(b)(1) is to identify

the specific Chapter 13 provisions which apply to plan modifications. To read §1329(b)(1) as

incorporating all of Chapter 13 simply because it includes the broad mandates of §1325(a) would

render the provision superfluous. If all provisions of Chapter 13 apply to plan modifications, there

would be no reason for §1329(b)(1) to have been drafted. *See Davis*, 439 B.R. at 868.

Beyond the fundamental statutory construction basis for holding that disposable income is

not a factor in plan modification, there is a key practical reason for rejecting the post-confirmation

recalculation of disposable income. Since the enactment of the Bankruptcy Abuse Prevention and

Consumer Protection Act of 2005 ("BAPCPA"), a precise formula has been utilized to calculate

disposable income. The formula produces a figure as of the time of confirmation which is not subject

to recalculation. As set forth above, the income side of disposable income — "current monthly

income"— is based on average income over the six calendar months before filing. 11 U.S.C.

§101(10A). Expenses for calculating disposable income are the actual, reasonable, and necessary

expenses of lower income debtors, with higher income debtors having some such expenses

determined by National and Local IRS standards in effect as of the date of filing. 11 U.S.C.

§1325(b)(3); 11 U.S.C. §707(b)(2)(A)-(B). This calculation yields a monthly amount of disposable

income which is then multiplied by the number of months in a debtor's applicable commitment

period, a figure which is also determined based on a debtor's income during the six calendar months

before filing. 11 U.S.C. §1325(b)(4). This calculation leads to a fixed sum required to be paid to unsecured creditors if the Trustee or unsecured creditors invoke the provisions of §1325(b)(1). This fixed amount is adjusted only for "changes in the debtor's income or expenses that are known or virtually certain at the time of confirmation." *Hamilton v. Lanning,* 130 S.Ct. at 2478.

Thus, since the enactment of BAPCPA, the calculation of disposable income yields a number as of confirmation that is not subject to change upon review at a later date when a modification is requested. *See In re York*, 415 B.R. 377, 382 (Bankr. W.D. Wis. 2009). Once correctly calculated, a debtors' income for the six months prior to filing and a debtor's expenses as of filing are fixed numbers. And, the adjustments in income or expenses known or virtually certain as of the date of confirmation are not changed by what the parties may come to know later.

The Trustee concedes this point and admits that the precise disposable income calculation enacted as part of BAPCPA cannot be used in future years to adjust what a debtor must pay to unsecured creditors. Rather, he suggests that some nebulous formula of comparing income and expenses — perhaps the old netting of Schedules I and J from pre-BAPCPA days — should be used for calculating disposable income for plan modifications. But, there is no authority for that argument. Under BAPCPA, the old best efforts test has given way to a new rigorous and formulaic calculation of disposable income. *Id.* Either §1325(b) applies to plan modifications in its entirety and as it is currently written or it does not apply at all. This Court holds, as it has before, that §1325(b) does not apply to plan modifications. To the extent the Trustee seeks to reset the Debtors' disposable income under §1325(b) by his Motion to Amend, the Motion must be denied.

### B. No Other Code Section Supports the Trustee's Motion to Amend

The remaining legal question then is whether there is any authority other than §1325(b) for the Trustee to rely on to require the Debtors to pay more to their unsecured creditors than originally

proposed in their confirmed Second Amended Plan. The Trustee does not specifically rely on any

other Code section in his Motion to Amend.

Only one of the provisions of Chapter 13 which applies to plan modifications addresses the

amounts which must be paid to unsecured creditors. Unsecured creditors must receive as much from

the payments under a Chapter 13 plan, including a plan modified post-confirmation, as they would

if a debtor's estate were liquidated under Chapter 7. 11 U.S.C. §1325(a)(4); 11 U.S.C. §1329(b)(1).

Thus, a hypothetical liquidation analysis must be performed in Chapter 13 cases to determine what

assets would be liquidated and what net amount after expenses might be available to pay a dividend

if the case were proceeding under Chapter 7. A debtor must propose to pay that net amount to

unsecured creditors under a Chapter 13 plan to obtain initial plan confirmation or approval of a plan

modification. *See Walker*, 2010 WL 4259274, at *6; *In re Trombetta*, 383 B.R. 918, 924 (Bankr.

S.D. Ill. 2008).

Here, the Debtors had no non-exempt property at the time of filing or initial confirmation.

Accordingly, no amounts were proposed to be paid to unsecured creditors in the Second Amended

Plan based on the required liquidation analysis. Further, the Trustee does not allege that the Debtors

have acquired property post-confirmation which would require or justify a modification based on

§1325(a)(4).

The Trustee relies heavily in his argument on *In re Wetzel*, 381 B.R. 247 (Bankr. E.D. Wis.

2008). The Trustee correctly quotes *Wetzel* as recognizing that, although the disposable income

requirements of §1325(b) do not apply to plan modifications, changes in a debtor's income and

expenses may be considered when reviewing a motion to amend. *Id.* at 252. The Trustee suggests

that such language describes an independent basis for plan modification. But, *Wetzel* clearly holds

that such changes in circumstances are relevant to the statutorily-created tests of good faith, best

efforts or liquidation analysis, and feasibility, which all apply to plan modifications. 11 U.S.C.

-12-

§1325(a)(3),(4),(6). *Wetzel* noted that a trustee who moves to modify a confirmed plan has the burden of proof on each of the statutory tests and may need to introduce evidence of current income and expenses to meet that burden. *Id*. at 254-55. *Wetzel* does not purport to create authority for plan modification outside of the applicable statutory provisions.

This Court has also previously stated that changes in circumstances related to income and expenses may be considered when reviewing proposed plan modifications. *Walker*, 2010 WL 4259274, at *10. But *Walker* dealt with a modification necessitated by the discovery of a previously-undisclosed asset and the requirement that the debtors there had to pay the liquidation value of that asset to their unsecured creditors. *Id.* at *6-8; 11 U.S.C. §1325(a)(4). The Trustee's Motion to Amend is not premised on any of the Code provisions discussed and relied on in *Wetzel* or *Walker*. The Trustee's use of the language from each case regarding the relevance of information about changes in income or expenses is taken out of context to the extent that the Trustee claims that the cases support a resetting of disposable income post-confirmation.

There is no authority for setting — or resetting — what Debtors must pay unsecured creditors other than the specific Code sections discussed above. Because the Trustee has neither alleged nor proven grounds for his requested plan modification under any applicable Code section, the Trustee's Motion to Amend must be denied.

### C. Neither the Facts Nor the Equities Support the Trustee's Motion to Amend

Having found that the Trustee cannot prevail on his Motion to Amend as a matter of law, it is not necessary to extensively discuss the Trustee's evidentiary presentation. A short review is appropriate, however, to clarify that there is also no factual or equitable basis to grant the Trustee's Motion to Amend.

In his brief, the Trustee argues that the Debtors should be required to pay their creditors if

they are able to do so. But, he has provided no proof that the Debtors here have the ability to pay any more than they already are paying. After filing, Mr. Coay lost his job due to a plant closing and his monthly income went from about $4800 gross to $1690 in unemployment benefits. After about 10 months, he found new employment, but the job was hundreds of miles away in another state. Although the details were not presented, Mr. Coay obviously incurred expenses in maintaining a separate household in Wisconsin and traveling on weekends to be with his family in Illinois. The Debtors lost their home and have moved. Mr. Coay left his Wisconsin job when he found work in Springfield, albeit at a lower salary. Although only one pay stub was provided for Mr. Coay's current employment, it appears that his current gross income is about $800 per month less than it was when the case was filed. Nothing about the picture the Trustee himself painted of these Debtors suggests that they have had some windfall, are leading a luxurious lifestyle, or otherwise are enjoying some unfair advantage while their creditors go unpaid. To the contrary, the limited evidence presented to this Court suggests that the Debtors are paying more to their unsecured creditors than they are obligated to pay.

The Debtors' first B22C filed in July 2009 showed significant disposable income, but was obviously inaccurate. The B22C contained no deductions for major expenses such as mortgage payments and transportation expenses. The Amended B22C filed in October 2009 showed much less disposable income, but also contained errors. Most notably, the Amended B22C included Mr. Coay's income as of the date of filing but not a deduction for the taxes payable on such income. By the time the Second Amended Plan was confirmed, Mr. Coay was receiving unemployment benefits and the Debtors' gross monthly income had been further reduced to a combined $3962. Although at this time this Court cannot — and need not — precisely calculate the Debtors' disposable income as of the date of confirmation, it appears that with total expense deductions on their Amended B22C of $5293.99, Debtors would have had negative disposable income and no obligation to pay any amount

to unsecured creditors. Of course, if the Trustee and the Debtors had actually made this calculation

at the time, either one or both might have proposed other changes.[2] But, based on everything before

the Court now, the evidence strongly suggests that, at the time, the Debtors' disposable income was

a negative number.

Notwithstanding all of this, the Debtors proposed and obtained confirmation of a Second

Amended Plan which included over $10,000 for unsecured creditors. Further, the Trustee says that

unsecured creditors whose claims total almost $30,000 are now projected to receive an 80%

dividend. This is mathematically possible only if the over $16,000 that the Debtors proposed to pay

on the mortgage arrearage claim which was withdrawn is now added to the dividend for unsecured

creditors.[3] Thus, according to the Trustee's own calculations, over $400 per month of the Debtors'

$600 monthly payments will go to pay unsecured creditors.

In making his arguments, the Trustee assumes that the amounts the Debtors are already

paying were compelled by the circumstances at the time of confirmation and that his requested

increase in plan payments is, therefore, compelled by increased income post-confirmation. The

---

[2] For example, the Trustee might well have argued that the Debtors should not have been allowed to deduct their mortgage payment to Marine Bank given the fact that the day after confirmation, they conceded a motion for stay relief with respect to the mortgaged property. The fact that the Debtors were not going to be able to save their home was likely known or virtually certain at the time of confirmation. But, if the mortgage payment deduction of $1346 had been removed, the Debtors would have been entitled to the IRS standard deduction for housing which they indicated on their Amended B22C was $916. Thus, the change would have been a net of only $430. This change would not have resulted in the Debtors having positive disposable income at the time of confirmation.

[3] The issue of whether the Trustee can use funds paid into a Chapter 13 plan and specifically designated for the payment of one class of creditors to pay a different class of creditors more than the plan provided for them is not before this Court. The Trustee apparently thinks he can proceed in this manner without first seeking plan modification. Perhaps the Debtors' use of the term "approximately" to describe the dividend to unsecured creditors has lead the Trustee to assume that he can use the funds designated for the withdrawn mortgage arrearage claim to pay unsecured creditors without specifically seeking authority to do so. The Trustee proceeds at his own risk in acting on his assumptions.

Trustee relied heavily on the Debtors' 2010 tax return which showed gross income of $101,094. But,

Mr. Coay testified credibly about his earnings that year and the fact that part of what was included

in his 2010 taxable earnings were payments for moving and relocation expenses he received from

Saputo Cheese. The Trustee complains in his brief that Mr. Coay failed to present documentary proof

of the exact amount and true nature of those payments. The Trustee, however, had the burden of

proof and he presented no evidence in support of his contention that all of the increased 2010 taxable

income represented spendable income. Further, by the time the Trustee's Motion to Amend was

filed, Mr. Coay no longer worked at Saputo Cheese, making the details of his earnings there

irrelevant. The Trustee also presented no evidence about the Debtors' current living expenses,

leaving the Court with no idea of whether the Debtors actually have any net income after paying

those expenses.

All of the evidence suggests that the Debtors are gratuitously paying unsecured creditors

significantly more than they would have been required to pay if they had litigated the issue in early

2010.[4] Nothing in the Trustee's presentation provides any factual or equitable basis to require them

to do more.

## IV. Conclusion

There is simply no authority to reset disposable income post-confirmation in the manner

requested by the Trustee here. Although the Trustee says that he is not seeking to recalculate the

---

[4] Obviously, it is impossible to know what the outcome of a contested hearing on confirmation in January 2010 might have been. *Hamilton v. Lanning* had not yet been decided, but this Court had previously announced on several occasions that it was following the emerging line of cases that considered changes in circumstances in income and expenses in calculating disposable income. *See, e.g., In re Sharp*, 394 B.R. 207, 216 (Bankr. C.D. Ill. 2008); *In re Carlton*, 362 B.R. 402, 406 (Bankr. C.D. Ill. 2007). Both the Trustee and the Debtor's attorney acknowledged in their arguments that Mr. Coay's loss of employment was a consideration in obtaining confirmation of the Second Amended Plan.

Debtors' disposable income, that is exactly what his Motion to Amend requests and the effort must be rejected regardless of how the Trustee characterizes the endeavor.

This Court recognizes that the Trustee has routinely filed motions to amend to seek increases in payments to unsecured creditors based on the same theories relied upon here and that, over the years, he has received little resistance from debtors or their attorneys. Almost without exception, the legal issues discussed here have not been raised by debtors or their attorneys and the disputes, if any, have centered only on how much of a payment increase will be made. But, the failure of parties to raise the applicable statutory and case law does not negate such controlling authority. Debtors are free to pay their creditors more than the statutes require, but this Court will not compel them to do so.

In his brief, the Trustee suggests that an injustice will occur if he is limited in his ability to compel increased payments while debtors maintain the right to move to amend their plans to decrease payments when they lose their jobs or sources of income. Debtors do not, however, have an unfettered right to modify their plans. Debtors who move to modify their confirmed plans bear the burden of proof and must establish entitlement to any requested modification based on all of the statutory tests discussed above. *See In re Kearney*, 439 B.R. 694, 696-97 (Bankr. E.D. Wis. 2010). Further, even if there is some merit to the Trustee's concerns, the remedy for the problem, if one is needed, should not come from this Court reading something into the statute that is simply not there. The Trustee's Motion to Amend must be denied.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

###